# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

—o0o—

| | |
|---|---|
| ODAY MOUNSAVENG, | 1:03-CV-05377 LJO JMD (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| ANTHONY A. LAMARQUE, Warden, | [Doc #1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. This action has been referred to this court pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72-302.

PROCEDURAL HISTORY

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Fresno, Case No. 590200-2.

Following a non-jury trial, Petitioner was found guilty of first degree murder and numerous robbery counts and associated enhancements and allegations. On April 29, 1999,

Petitioner was sentenced to life without the possibility of parole for the murder conviction, plus a total of 53 years for the other counts, prior convictions, and all enhancements. See Respondent's Answer, Exh. 1 (Abstract of Judgment).[1]

Petitioner timely appealed to the California Court of Appeal, Fifth Appellate District ("Fifth DCA"), case number F033224, claiming denial of his state and federal constitutional rights to a fair trial and equal protection of the law based on the prosecutor's exercise of peremptory challenges to two African-American prospective jurors. *See* Exh. 2 (Petitioner's Opening Brief); Exh. 3 (People's responsive brief); Exh. 4 (Petitioner's reply brief). On March 22, 2001, the Fifth DCA affirmed Petitioner's conviction and sentence in a published opinion. Exh. 5 (Opinion of the Fifth DCA).

On April 24, 2001, Petitioner timely petitioned the California Supreme Court for review, case number S096988. Exh. 6. On July 11, 2001, the California Supreme Court granted review of Petitioner's petition; however, on October 16, 2002, that petition was dismissed as having been improvidently granted pursuant to former California Rules of Court, Rule 29.4© (now Rule 29.3(b)). Exh. 7.

On March 28, 2003, Petitioner filed the instant petition. Respondent answered on September 3, 2003. On December 1, 2003, Petitioner filed a traverse to Respondent's Answer.

## FACTUAL BACKGROUND

The Court adopts the facts as recited by the Fifth DCA in its opinion dated March 22, 2001:

> The prosecution's case against appellant encompassed five incidents. The first occurred on July 31, 1996, when appellant and his codefendant, Vaene Sivongxxay, attempted to rob the Thanh Tin jewelry store. During his third visit to the store that day, appellant grabbed the owner by the neck and pointed a gun at her head. However, the robbery was interrupted by the store's alarm. As soon as it sounded appellant and Sivongxxay fled.
> On August 16, 1996, appellant and Sivongxxay robbed the JMP Mini-Mart. On this occasion, Sivongxxay brandished a gun while appellant took money from the register, and grabbed cigarettes and other items. They also took a bank bag containing $8,000. At one point Sivongxxay ordered the store's owner to the floor and then kicked him in the head.
> The next robbery took place on October 10, 1996. Appellant and Sivongxxay entered the Phnom Penh jewelry store a few minutes apart. Appellant had had a pendant repaired during an earlier visit and wanted further work done on it. However, after the owner sat down to do the requested repair, appellant and Sivongxxay pulled him away from his chair, held their guns to his

---

[1] All subsequent Exhibit references are to the exhibits attached to Respondent's Answer, unless otherwise noted.

2

cd

head and beat him.  After tying the owner up, appellant demanded access to the cash in the store from the owner's wife.  Meanwhile, Sivongxxay collected displayed jewelry.  Appellant and Sivongxxay left with approximately $30,000 in cash and merchandise.

The JMP Mini-Mart was the target for a second time on December 14, 1996.  Appellant and Sivongxxay burst through the door wielding handguns and ordered everyone inside to get down on the floor.  Thereafter, they victimized the owner and seven customers.  One customer, an elderly woman, sustained physical injuries when Sivongxxay kicked her in the mouth and hit her on the head.  Appellant and Sivongxxay left with money and property, including the owner's handgun that appellant had taken from under the counter.

The final robbery took place on December 19, 1996.  Appellant and Sivongxxay entered the Sean Hong jewelry store where Sivongxxay had left a pendant to be repaired a few weeks earlier.  After Sivongxxay and appellant examined the repaired pendant, they pulled out their guns and pointed them at the store's owners, Seak Ang Hor and Henry Song.  Appellant screamed "'give [me] the money and gold'" and forced Song toward the cash register.  Hor and Song were thereafter ordered to the back room where the safe was.  However, Hor crawled away.  She then banged and kicked on a wall in a desperate attempt to alert her neighbors.

Appellant and Sivongxxay left the store after taking approximately $30,000 to $40,000 in cash and jewelry.  Hor returned to the back room and saw that Song was on the floor bleeding.  Apparently, Song and Sivongxxay had engaged in a struggle.  Song was shot three times by Sivongxxay and died from his wounds.

A store video surveillance camera recorded parts of this robbery.  From this tape, law enforcement was able to identify Sivongxxay and appellant.  Based on photographs distributed by the Fresno Police Department, appellant was arrested in Minnesota on February 7, 1997.  Sivongxxay was arrested five days later.

Appellant and Sivongxxay were both charged with the first-degree murder of Henry Song (§ 187).  A special circumstance was alleged in that the murder occurred during a robbery.  (§ 190.2, subd. (a)(17)).  The information further charged both defendants with 14 counts of robbery and one count of attempted robbery.  (§§ 211, 212.5 and 664).  Weapons and personal firearm use enhancements were also alleged (§§ 12022 and 12022.5).

The prosecution sought the death penalty.  Appellant waived a jury trial and both he and Sivongxxay were tried jointly before the court.

In defending these charges, appellant did not contest his involvement in the robberies.  Instead, appellant claimed he acted under duress.  Appellant outlined a sequence of events that precipitated his participation in both the charged and several uncharged robberies.

Appellant testified that the coercion began in December 1995, approximately one year before the murder took place.  While appellant and his girlfriend, Kathy Sengphet, were at the hospital with their youngest child, appellant received a telephone call from a man that he knew as "Turre."  Turre asked appellant to meet him at a certain location.  However, after appellant arrived there with his other young son, appellant was tied up and he and the child were kidnaped.  Turre, and African-American man named "Frank" and a third man appellant believed to be Sivongxxay drove appellant around in his car for approximately 90 minutes.  Appellant was asked if he had any money to pay a debt owed by his friend "Lut."  Appellant did not and he and his son were eventually released.

Appellant returned to the hospital and told Sengphet what had happened.  At first Sengphet did not believe him.  However, later that evening appellant and Sengphet saw the same three men standing near their house.  Thereafter, Sengphet reported the matter to the police.

Following this kidnaping, appellant drove to Visalia and stayed with a friend.  About two weeks later appellant returned to Fresno.  However, appellant was afraid for himself and his family.  Appellant and Sengphet then moved to Portland, Oregon to stay with appellant's parents.

Nevertheless, this move did not prove to be a successful escape.  Turre soon found appellant in Portland.  On January 17, 1996, Turre and two other Asian men appeared at appellant's parents' house and asked appellant for money.  Appellant responded that he did not have any.  The men then pointed a gun at appellant and told him to go with them.  Appellant refused and the men left.  A short time later a car drove by and three or four shots were fired at the house.

cd                                                    3

A few weeks later appellant and Sengphet moved back to Fresno with their children. Then, around May 19965, Turre approached appellant again. Turre, Sivongxxay, and a third Asian man told appellant that they would contact him and he would have to help rob a store at that time. Appellant testified he was scared so he answered ""Yes, do not disturb my family, myself.""

Sivongxxay and two other men made contact with appellant about a month and a half later. They ordered appellant to accompany them while they robbed a store. Appellant agreed to act as the getaway driver because he was afraid. However, appellant was not charged with this robbery.

A second uncharged robbery took place one or two weeks later. Again appellant drove the getaway car. Appellant stated that Sivongxxay threatened to "'do something'" to his family if he did not participate.

With respect to the charged robberies, appellant testified that his involvement was forced through fear. He further claimed that his gun was unloaded and that he never received any of the cash or loot.

Following the murder, appellant fled to Los Angeles because he was scared. From there he went to Minnesota to join Sengphet and the children. Sengphet had been in Minnesota since September.

## DISCUSSION

I. **Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn. 7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Fresno County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d). Accordingly the Court has jurisdiction over this action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied*, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after its enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

4

II.  **Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C . § 2254(a).

The instant petition is reviewed under the provisions of the AEDPA.  Lockyer v. Andrade, 538 U.S. 63, 70 (2003).  Under the AEDPA, a petition for habeas corpus will not be granted unless the adjudication in question "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding."  28 U.S.C. § 2254(d); *see* Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining "clearly established Federal law," the Court looks to the "holdings, as opposed to the dicta, of [Supreme Court] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412.  "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; *see also* Lockyer, 538 U.S. at 72.  "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

1    This Court may not issue the writ simply because in its independent judgment the state
2  court decision applied clearly established federal law erroneously or incorrectly; for a writ to
3  issue, 'that application must also be unreasonable." Id. at 411. A federal habeas court making
4  the "unreasonable application" inquiry should ask whether the state court's application of clearly
5  established federal law was 'objectively unreasonable." Id. at 409.

6    Petitioner has the burden of establishing that the decision of the state court is contrary to
7  or involved an unreasonable application of United States Supreme Court precedent. Baylor v.
8  Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the
9  states, ninth circuit precedent remains relevant persuasive authority in determining whether a
10 state court decision is objectively unreasonable. *See* Duhaime v. DuCharme, 200 F.3d 597, 600-
11 01 (9th cir. 1999).

12    AEDPA requires that this court give considerable deference to state court decisions. The
13 state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). Moreover, we are
14 bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.
15 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

16 III.  **Review of Petitioner's Claim**

17    Both Petitioner and Respondent acknowledge the Fifth DCA's finding that error occurred
18 at the trial level in the trial court's standard for analyzing the duress defense. At issue is the
19 effect (if any) of this error. Petitioner makes two arguments. First, he claims that the trial court's
20 error in applying the incorrect burden of proof was "structural error" necessitating automatic
21 reversal of his conviction. Petitioner's Traverse at p. 4. Second, he claims that – even assuming
22 the error is subject to harmless-error analysis – applying the necessity defense's "no legal
23 alternative requirement" to his duress defense was prejudicial error requiring reversal. Id.

24    A.    **Factual Background**

25    As part of the closing argument, the prosecutor asserted that appellant had not proved his
   duress defense by a preponderance of the evidence. Defense counsel did not disagree with the
26 prosecutor's choice of standard. Rather, counsel argued that appellant had met this burden.
   Thereafter the trial court found both defendants guilty of one count of first-degree
27 murder, 13 counts of robbery, and two counts of attempted robbery. The special circumstance
   enhancement, the weapons enhancements, and the prior convictions were all found to be true.
28 With regard to the murder, the court ruled that Sivongxxay was the actual killer and that

appellant aided and abetted the underlying robbery with "a clear, reckless indifference to human life as a major participant."

In ruling on appellant's duress defense, the court stated:

> "The Court has considered the affirmative defenses of duress raised directly by [appellant] and somewhat indirectly through his statement to Detective Wells raised by defendant Sivongxxay. I find insufficient evidence of duress to rise to a standard of preponderance of the evidence as to each defendant.
> "[Appellant] has established a prima facie case that would lead me to believe there is the possibility that his initial entry into the robbery consortium that Mr. Sivongxxay and possibly others were in, however, this is not proof rising to a probability, *and would only apply to uncharged robberies that were testified to by [appellant]. It is clear that in – in between the time of those uncharged robberies that he testified to and the charged – the first charged offense in this case, he had ample opportunity to alert authorities to protect himself and his family, long periods of time unaccompanied by any other persons who were in a position to threaten him or his family with any imminent peril or danger.*
> "Having found the duress as to each defendant does not rise to the level of a preponderance of the evidence, but at best would be evenly balanced, the Court need not address the more technical legal issues of applicability of duress to the various types of offenses involved in this case.
> "The court simply finds insufficient evidence of that duress to affect any of these charges or enhancements." (Emphasis added)

Appellant was sentenced to life without the possibility of parole on the murder conviction. An additional total term of 53 years was imposed for the other counts, prior convictions, and enhancements. Sivongxxay was sentenced to death.

**B.    Clearly Settled Supreme Court Law**

Constitutional error at trial does not automatically necessitate reversal of criminal convictions. Chapman v. California, 386 U.S. 18 (1967). An otherwise valid conviction should not be set aside if the constitutional error is found to be harmless. Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986).

The Court has, however, recognized that some constitutional errors "necessarily render a trial fundamentally unfair" and therefore require reversal without engaging in harmless error analysis. Rose v. Clark, 478 U.S. 570, 577 (*citing* Chapman, 386 U.S. at 23, n. 8).[2] These so-

---

[2] Examples of "structural error" identified by the Court in Chapman include: use of a coerced confession, denial of the right to counsel, and denial of the right to an impartial judge. *See* Arizona v. Fulminante, 499 U.S. 279, 306-307 (opinion of Rehnquist, C.J., for the court) (citing Chapman examples and collecting examples of errors *not* requiring immediate reversal of a conviction). Subsequent cases have expanded upon the Chapman list to include such errors as: directing a verdict for the prosecution in a jury trial (*see* Rose, 478 U.S. at 578); and, notably, the giving of a constitutionally-deficient reasonable doubt instruction (Sullivan v. Louisiana, 508 U.S. 275, 281-282).

7

called "structural" errors "affect the very framework within which the trial proceeds, rather than being simply errors in the trial process itself." Arizona v. Fulminante, 499 U.S. 279, 310 (1991). As such, they result in a trial which "cannot reliably serve its function as a vehicle for determination of guilt or innocence, and no criminal punishment may be regarded as fundamentally fair." Rose, 478 U.S. at 577-578 (citation omitted).

These structural errors requiring immediate reversal of the conviction are the exception rather than the rule. United States v. Hasting, 461 U.S. at 509. The majority of errors at the trial level are subject to harmless-error analysis. See Rose, 478 U.S. at 579 ("[I]f the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis."); see also Arizona v. Fulminante, 499 U.S. at 306-307 (collecting examples).

On direct review, trial error is analyzed under the standard articulated in Chapman v. California, 386 U.S. 18 (1967). In Chapman analysis, a constitutional error is harmless if the reviewing court is "able to declare a belief that it was harmless beyond a reasonable doubt." 386 U.S. at 24. For purposes of habeas corpus review, however, a different standard exists. See Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (articulating the difference between harmless-error review on direct and collateral appeal). At the habeas level constitutional error results in reversal "only if it 'had a substantial and injurious effect or influence in determining the...verdict." Brecht, 507 U.S. at 631, quoting Kotteakos v. United States, 328 U.S. at 776. Under this standard, habeas petitioners may obtain plenary review of their constitutional claims, but they are not entitled to relief based on trial error unless they can establish that it resulted in "actual prejudice." Id. at 637, citing United States v. Lane, 474 U.S. 438, 449 (1986).

**C.    Review by the State Courts**

As noted above, Petitioner's claim was first heard by the Fifth DCA, which rejected it on March 22, 2001 in a published opinion. The Fifth DCA held that the trial court had committed error in that it incorrectly applied a preponderance of the evidence standard to Petitioner's duress defense. Exh. 5 at 9. It further held that this error was analogous to relieving the prosecution of proving beyond a reasonable doubt that the defendant had the capacity to commit the charged

offense, and that therefore Petitioner's due process rights were violated. Id.

Having determined that there was in fact constitutional error, the Fifth DCA went on to discuss the appropriate standard of review to be applied to the error. The state appellate court held that the error was subject to the harmless error analysis as set forth in Chapman v. California, 386 U.S. 18 (1967). The court noted that under the federal standard a limited number of "structural errors" require automatic reversal, but that "the vast majority of constitutional errors fall within the broad category of trial error subject to harmless error review under Chapman." Exh. 5 at 9-10.

The Fifth DCA analogized the trial court's error to a jury instruction that impermissibly lightens the prosecution's burden of proof on an element of the offense. Id., citing Rose v. Clark, 478 U.S. 570, 579-582 (1986). The Fifth DCA held that, like such an error in the jury instruction, the error in question should not result in a setting aside of the conviction "if this court can confidently say on the entire record that the constitutional error was harmless beyond a reasonable doubt, i.e. the error did not contribute to the court's verdict." Id., citing Rose, 478 U.S. at 576.

Analyzing the error under the Chapman standard, the Fifth DCA found the error to be harmless. It noted that – while the trial court had found Petitioner had established a prima facie case of duress and then incorrectly applied a preponderance standard – it "specifically limited this finding to the *uncharged* robberies." Id. at 10, emphasis in original. Thus, the error could not have contributed to the verdict.

With respect to the charged offenses, the Fifth DCA noted that the trial court had made a different finding. The trial court found "it was *clear* that between the time of the uncharged robberies and the first charged robbery appellant 'had ample opportunity to alert authorities to protect himself and his family, long periods of time unaccompanied by any other persons who were in a position to threaten him or his family with any imminent peril or danger.'" Id. at 11, emphasis in original. Relying on United States v. Bailey, 444 U.S. 394 (1980), the Fifth DCA noted that neither the necessity nor the duress defense is available "if there was a reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to

1   avoid the threatened harm.'"  Id., citing Bailey, 444 U.S. at 410.

2          Because of the trial court's finding that Petitioner had the ability to refuse to participate in
3   the robberies and to avoid the threatened harm (by alerting the authorities) before the charged
4   offenses, the Fifth DCA held that the trial court's application of an incorrect burden of proof as
5   to appellant's defense was harmless error.

6          Petitioner argued that Bailey did not control because Bailey analyzes federal criminal law,
7   and that the version of the duress defense existing in California law does not include a "no-
8   lawful-alternative prerequisite."  The Fifth DCA noted both that the prerequisite had been
9   adopted by the California courts in People v. Heath, 207 Cal.App.3d 900 (date), and that Bailey
10  rule was the logical underpinning of the duress defense.  Exh. 5 at 11-12.  The Fifth DCA
11  therefore determined that the trial court had properly incorporated this prerequisite into its
12  analysis of Petitioner's duress defense.  Id. at 12.

13  **D.    Analysis of Petitioner's Claims**

14         Petitioner, Respondent, and the Fifth DCA are all in agreement that constitutional error
15  occurred in this case.  The Fifth DCA states:

16  > an error that relieves the prosecution of the burden of proving each element of the
17  > charged offense beyond a reasonable doubt violates the defendant's due process
18  > rights....Since duress negates the mens rea element of the crime, the defendant
19  > need only raise a reasonable doubt that he acted under the exercise of his own free
20  > will.  Thus, when the trial court required appellant to demonstrate duress by a
21  > preponderance of the evidence, it lightened the prosecution's burden of proof.
22  > This shift in the burden of proof is analogous to relieving the prosecution of
23  > proving beyond a reasonable doubt that the defendant had the capacity to commit
24  > the charged offense.  Consequently appellant's due process rights were violated."

21  Exh. 5 at p. 9.

22         Given this error, there remain two questions.  First, was the Fifth DCA's determination
23  that harmless-error analysis applied reasonable?  Second, if harmless-error analysis is applicable,
24  did the error in question have "substantial and injurious effect or influence" in determining the
25  trier of fact's verdict?  Brecht, 507 U.S. 619, 623 (1993), quoting Kotteakos, 328 U.S. at 776.

26       **1.    Is the Error in Question Subject to Harmless-Error Analysis?**

27         Our review is limited to determining whether the decision of the Fifth DCA was contrary
28  to, or an unreasonable application of, relevant Supreme Court precedent.  Lockyer, 538 U.S. at

cd                                            10

1  72. There does not to be any case directly dealing with the situation where the trier of fact in a
2  criminal bench trial applies the wrong burden of proof standard to an affirmative defense.
3  Instead, both Petitioner and Respondent argue by analogy to errors in jury instructions.
4        Petitioner argues that harmless-error analysis cannot be applied in this case, because "a
5  trier of fact's use of an erroneous burden of proof as to an element so gravely offends our
6  Constitution, and violates so basic a right, that it requires automatic reversal." Traverse at p. 4.
7  In support of this claim, Petitioner cites Jackson v. Virginia, 443 U.S. 307 (1979). Specifically,
8  Petitioner points to the Court's statement that "[o]ur cases have indicated that failure to instruct a
9  jury on the necessity of proof of guilt beyond a reasonable doubt can never be harmless error.
10 (citations)." Id. at 320, n. 14. Petitioner argues that the trial court's use of a preponderance
11 standard regarding his duress claim is equivalent to misinstructing the jury with regards to the
12 burden of proof on the element of intent, and that the language in Jackson therefore controls,
13 requiring immediate reversal without consideration of the error's harm. Traverse at p. 4.
14       Although not cited by Petitioner, Sullivan v. Louisiana, 508 U.S. 275 (1993) is also
15 relevant to this inquiry. In Sullivan, the Supreme Court addressed a case in which the jury was
16 given instructions that defined "reasonable doubt" in a manner previously held unconstitutional.
17 Id. at 277. The Court held that the error in question was not amenable to harmless-error analysis
18 and required immediate reversal of the conviction. Id. at 279-280. The Court noted that
19 harmless-error review looks to the basis on which the jury actually rested its verdict. Id., *citing*
20 Yates v. Evatt, 500 U.S. 391, 404 (1991). But where a jury has been misinformed as to what
21 constitutes reasonable doubt, there has been no jury verdict of guilty beyond a reasonable doubt,
22 rendering meaningless the question whether the same verdict would have been rendered absent
23 the error in question. Id. at 280-281 ("the essential connection to a 'beyond a reasonable doubt'
24 factual finding cannot be made where the instructional error consists of a misdescription of the
25 burden of proof, which vitiates *all* the jury's findings.").
26       The Fifth DCA based its determination that harmless-error applied on the Supreme
27 Court's holding in Rose v. Clark, *supra*, 478 U.S. at 579-582. In Rose, the Supreme Court held
28 that harmless-error analysis applied to a jury instruction which unconstitutionally shifted the

cd
11

burden of proof on the issue of intent.³ The Court noted that some errors "necessarily render a trial fundamentally unfair" such that they are not subject to harmless-error analysis, but that these "are the exception and not the rule." Id. at 577-578. With respect to the deficient jury instruction in question, the Rose Court found the error amenable to harmless-error analysis. The instruction had not prevented the defendant from putting on evidence or making arguments to support his claim of innocence. Id. at 579. He was tried by a fairly selected, impartial jury, supervised by an impartial judge. Id. And aside from the malice instruction, the jury "was clearly instructed that it had to find respondent guilty beyond a reasonable doubt as to every element" of the charged offenses. Id. The Court therefore found that the error was not "structural" and was subject to review for harmlessness.

In light of the language in Rose, it was not unreasonable for the Fifth DCA to find that harmless-error analysis did in fact apply to the error in question. Indeed, as the Supreme Court notes in Pope v. Illinois, "[t]o the extent that cases prior to Rose may indicate that a conviction can never stand if the instructions provided the jury do not require it to find each element of the crime under the proper standard of proof..., after Rose, they are no longer good authority." Pope, 481 U.S. 497, 503 n. 7. Sullivan, for its part, does not overturn the holding in Rose, but instead distinguishes a situation where reasonable doubt is misdefined. See Sullivan, 508 U.S. at 280-281 (distinguishing Rose); see also Id., at 284 (Rehnquist, C.J., concurring) ("a constitutionally deficient reasonable-doubt instruction is a breed apart from the many other instructional errors that we have held *are* amenable to harmless-error analysis."). Nothing in the record suggests that the trier of fact (in this case, the trial judge) was unaware of or misinformed as to the nature of reasonable doubt. Given this, it is not unreasonable for the Fifth DCA to have found that the trial judge's application of the wrong standard with respect to Petitioner's duress defense was equivalent to the error in Rose and likewise subject to harmless-error review.

---

³ The jury in Rose was instructed that "[a]ll homicides are presumed to be malicious in the absence of evidence which would rebut the implied presumption. Thus, if the State has proven beyond a reasonable...doubt that a killing has occurred, then it is presumed that the killing was done maliciously." 478 U.S. at 574.

12

**2.    Is the Error Harmless?**

The standard of review for harmless error in habeas corpus proceedings is "whether...the error 'had substantial and injurious effect or influence in determining the [trier of fact's] verdict." Brecht v. Abrahamson, 507 U.S. 619, 623 (1993), *quoting* Kotteakos v. United States, 328 U.S. 750, 764-765 (1946). Errors which have only "slight effect" on the jury do not mandate relief, but errors that "substantially sway[]" the jury require relief. Kotteakos, 328 U.S. at 764-765. Rather than considering how a reasonable trier of fact might have been impacted by the constitutional error, the proper inquiry is what effect the error *actually had* upon the guilty verdict in question. *See*, Id. at 764.

The Fifth DCA held the error in question harmless. Although the trial judge did say that Petitioner may have established a prima facie case of duress, that statement was expressly limited to the uncharged offenses. Exh. 5 at 10. With respect to the charged crimes, the trial court determined it was *clear* that Petitioner "had ample opportunity to alert authorities to protect himself and his family, long periods of time unaccompanied by any other persons who were in a position to threaten him or his family with any imminent peril or danger." Id. at 11. The Fifth DCA reasoned that, where there is a "reasonable, legal alternative to violating the law, 'a chance both to refuse to do the criminal act and also to avoid the threatened harm,' the defenses [of necessity and duress] will fail." Id., *quoting* United States v. Bailey, 444 U.S. 394, 410 (1980). Because Petitioner had not availed himself of this "ample opportunity" to avoid committing the charged offenses, the Fifth DCA found that his duress defense failed as a matter of law, rendering meaningless the trial court's error.

Petitioner argues that the Fifth DCA's reliance on Bailey is misplaced, since it analyzes federal rather than California criminal law. Petitioner notes that the duress defense as it exists in the California Penal Code contains no such 'no-lawful-alternative prerequisite' language. The Fifth DCA, however, found that such a prerequisite was adopted by the California court in People v. Heath, 207 Cal.App.3d at p. 892, 900 (1989). Additionally, the Fifth DCA found that the rule in Bailey is the "logical underpinning" of the duress defense, as a defendant cannot have been responding to an immediate and imminent threat or acting without the requisite mens rea if

he chose not to take a reasonable, legal alternative to violating the law.  Exh. 5 at 11.

This Court cannot, on habeas corpus review, second-guess the determinations of the Fifth DCA regarding the prerequisites for asserting a duress defense under California law.  "We have stated many times that 'federal habeas corpus relief does not lie for errors of state law.'" Estelle v. McGuire, 502 U.S. 62, 67-68 (1991), *quoting* Lewis v. Jeffers, 497 U.S. 764, 780 (1990).  Thus, to the extent Petitioner challenges Heath or the applicability of the no-lawful-alternative prerequisite as a matter of state law, habeas relief cannot lie for such a challenge.

To the extent Petitioner claims the prerequisite as a matter of federal law, Petitioner's claim is without merit.  As the Fifth DCA notes, the Supreme Court in United States v. Bailey expressly holds lack of a reasonable and legal alternative to violating the law to be a precondition "under any definition of" duress.  444 U.S. at 410.

Lastly, Petitioner is incorrect in claiming that, even assuming Heath and Bailey are applicable, he in fact "did not have effective lawful alternatives to committing the charged crimes."  Traverse at p. 10.  The trial judge found that "in between the time of those uncharged robberies that he testified to and the...first charged offense in this case, he had ample opportunity to alert authorities to protect himself and his family, long periods of time unaccompanied by any other persons who were in a position to threaten him or his family with any imminent peril or danger."  Exh. 5 at 7. In light of this, Petitioner's claim that he lacked an effective lawful alternative to committing the robberies in question is without merit.

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED and the Clerk of the Court be DIRECTED to enter judgment.

These Findings and Recommendations are submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned

1  "Objections to Magistrate Judge's Findings and Recommendations."  Replies to the objections
2  shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail) after
3  service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
4  28 U.S.C. § 636 (b)(1)(c).  The parties are advised that failure to file objections within the
5  specified time may waive the right to appeal the District Court's order.  Martinez v. Y1st, 951
6  F.2d 1153 (9th Cir. 1991).

8  IT IS SO ORDERED.
9  **Dated:    September 28, 2007**                    /s/ John M. Dixon
                                                    UNITED STATES MAGISTRATE JUDGE